## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | | |
|---|---|---|
| BRUNO ZEITEL, | ) | |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | Civil Action No.: 5:22-cv-228 |
| J2 MARTECH CORP., f/k/a ICONTACT | ) | Jury Trial Demanded |
| MARKETING CORP., | ) | |
| Defendant. | ) | |
| | ) | |

NOW COMES PLAINTIFF, BRUNO ZEITEL, by and through undersigned counsel, and complains against Defendant J2 Martech, Corp., f/k/a iContact Marketing Corp., as follows:

## INTRODUCTION AND NATURE OF THE CASE

Plaintiff brings this action against Defendant for national origin discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Civil Rights Act of 1991, 42 U.S.C. § 1981. Further, Plaintiff asserts that Defendant wrongfully discharged him in violation of North Carolina public policy. Plaintiff seeks all available remedies including but not limited to, compensatory, punitive, and liquidated damages, as well as available equitable relief pursuant to 42 U.S.C. § 2000e-5(f)-(k), 42 U.S.C. § 1981a, and as otherwise authorized pursuant to law.

## JURISDICTION

1.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims for relief asserted herein arise under federal law, and under 28 U.S.C. § 1343(a)(4), as the claims herein seek relief under acts of Congress providing for the protection of civil rights.

2.     This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a).

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

4.     Plaintiff Bruno Zeitel ("Mr. Zeitel") is a citizen and resident of Wake County, North Carolina. Mr. Zeitel, a Hispanic male of South American descent, was employed by Defendant J2 Martech, Corp., f/k/a iContact Marketing Corp., from July 5, 2016, until Defendant terminated him on February 28, 2022. At all times relevant hereto, Plaintiff constituted an "employee" pursuant to all applicable statutes.

5.     Defendant J2 Martech, Corp., f/k/a iContact Marketing Corp. ("Defendant" or "iContact"), is a foreign corporation organized and existing under the laws of the State of Delaware. Defendant is authorized to do business in the State of North Carolina and maintains a registered office located at 2626 Glenwood Avenue, Suite 550, Raleigh, N.C. 27608. At all times relevant hereto, Defendant has continuously employed at least 20 employees.

6.     At all relevant times, Defendant has continuously constituted an employer engaged in an industry affecting commerce in accordance with sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e (b), (g), and (h).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.     Mr. Zeitel signed and filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 22, 2022, alleging violations of Title VII.

8.     The EEOC issued Mr. Zeitel a Determination and Notice of Rights on March 8, 2022. The Notice of Rights indicated that Mr. Zeitel had 90-days from receipt of the Notice within which to file a lawsuit.

9.     Mr. Zeitel complied with all deadlines related to the investigation of his formal administrative complaint.

10.     All conditions precedent to the institution of this arbitration have been fulfilled.

## FACTUAL ALLEGATIONS

11.     Defendant is a "leading provider of marketing technology solutions to small and medium-sized enterprises." Defendant owns and operates iContact and several other "sister companies" that assist businesses to "engage their customers digitally and grow their revenue by leveraging the power of online search, email, voice, and text communications."

12.     Mr. Zeitel worked for iContact, a web-based email marketing platform which provides its customers with "easy to use" email marketing tools which help businesses "grow their audiences" through personalized emails and automated communications. iContact also markets that it provides "award-winning support" to help small businesses grow.

13.     Mr. Zeitel was hired at iContact as a Bilingual Product Expert on or about July 5, 2016. In this role, Mr. Zeitel provided support to iContact users via telephone, email, and online chat applications. Mr. Zeitel excelled in his role as a Bilingual Product Expert and, in 2017, was promoted to Pro Support Team, which consisted of only two employees. As a member of the Pro Support Team, Mr. Zeitel provided customer support to subscribers of iContact's premium subscription services. This required Mr. Zeitel to possess advanced knowledge of the company's applications. Because he was one of few Spanish-speaking employees, Mr. Zeitel continued to assist Spanish-speaking customers regardless of whether they were a "Pro" subscriber.

3

14.     In 2018 Mr. Zeitel was again promoted to the position of Senior Product Expert. In his role as Senior Product Expert, Mr. Zeitel worked under the Manager of Support, Nick Seward ("Seward"), in an "assistant-manager" type capacity. He was responsible for: (1) supervising his team of product experts (who provided telephone and online chat support to customers); (2) handling Manager Escalations, such as refund requests and outreach to disgruntled customers (Mr. Zeitel was one of only a few middle-level who was granted permissions to void charges and process refunds); (3) completing various types of reporting, including Quality Assurance ("QA") reports for team coaching, Daily Activity Reports; (4) reviewing and updating the Help Portal and other customer-facing documentation; (5) in-depth investigation of more advanced platform-based questions using ChurnZero; (6) assisting the Message Review Team queues (work he performed on Saturdays from 7:00 p.m. to 2:00 a.m.); (7) training and onboarding to new hires and all billing agents; and (8) overseeing the Billing Tasks queue, which consisted of reviewing and approving all final product sales made by the Sales team to confirm accuracy. Mr. Zeitel was the subject matter expert and point of contact for Tier 1, Tier 2, and Tier 3 teams, as well as other Company departments, including Sales, Account Managers, and Customer Success Managers. He also created and led Customer Service Excellence and platform-related training for current employees. In addition to taking on the duties of his new role as Senior Product Expert, Mr. Zeitel continued to assist the Pro Support Team and provided basic customer-support to Spanish-speaking customers.

15.     At the time Mr. Zeitel received his promotion, Sarah Riffi ("Riffi"), a Caucasian female who had joined the Company only four (4) months prior in January 2018 as a Product Expert, was also promoted to Senior Product Expert. Riffi, a Caucasian female, had joined iContact in January 2018. Prior to being promoted to Senior Product Expert, she had not worked on the Pro

Support Team. Unlike Mr. Zeitel, when Riffi was promoted, she did not maintain additional responsibilities from her previous position, nor did she take on additional responsibilities outside of her role as Senior Product Expert. For instance, Mr. Zeitel handled the majority of the Spanish call volume and continued to support the Pro Team during its migration to a new platform. During this time Defendant offered Mr. Zeitel the ability to work overtime from 9:00 a.m. to 7:00 p.m. to ensure he could provide Pro Team coverage and complete the managerial duties of his Senior Product Expert position.

16.     As a Senior Product Expert, Mr. Zeitel continued to excel at his job. He received positive performance reviews from Seward, his manager, who often asked Mr. Zeitel to train new employees on Defendant's systems and applications.

17.     In January 2020, despite Mr. Zeitel's outstanding performance and superior level of product-based knowledge as a Senior Product Expert, Defendant promoted Riffi, a less experienced and less qualified Caucasian, to Team Lead. In this position, Riffi was responsible for creating the daily schedule, assisting (for a limited time) with reporting, and attending meetings with upper-level managers while Mr. Zeitel watched over the team and assisted with the queues.

18.     In March 2021, Mr. Zeitel was awarded the 2020 Q4 Achievement Award for his outstanding performance during the Company's fourth quarter. He was nominated for this award by his peers and ultimately selected by Harry Broome ("Broome"), Defendant's Senior Manager of Support, and other members of Defendant's upper-management team. Riffi was not nominated for, nor did she receive any performance-based awards for her work in 2020. However, on the same day that Mr. Zeitel received his Q4 Achievement Award, Defendant again promoted Riffi—this time to a Customer Operations Manager position. In this position, Riffi was considered a lateral employee to Seward. As a Customer Operations Manager, Riffi was responsible for the Tier

5

3 Team (Support Engineers), despite having no working knowledge of how the Tier 3 Team operated because, prior to her promotion, she only had experience working with Tier 2 and below.

19.     Mr. Zeitel was surprised and disappointed that Riffi was again promoted while he continued to provide higher-quality work for the Company. For instance, Mr. Zeitel had become the "go-to" billing escalations manager handling nearly all the refund requests and Sales' team approvals. He developed and lead training sessions for the Company's Pro platform and customer excellence training. He edited and reviewed Help Portal adjustments (work typically handled by Tier 3 Team and its managerial staff). Additionally, Mr. Zeitel handled nearly all QAs and CSATs himself, though these reports should have been split between management, including Riffi.

20.     After learning of Riffi's promotion to Customer Operations Manager, Mr. Zeitel contacted Broome regarding the presumably open Team Lead position, left vacant following Riffi's promotion. Broom noted that Mr. Zeitel did excellent work on behalf of the Company and had received a "glowing" performance review from Seward in 2020; however, Broome informed him that Defendant did not intend to fill the Team Lead position because, between Seward and Riffi, the managerial duties "covered."

21.     Within one week of her promotion, Riffi called a meeting with Mr. Zeitel and informed him that she was now his supervisor. She also asked Mr. Zeitel for a list of his duties and responsibilities. Mr. Zeitel found this request odd since, as a former Senior Product Manager, Riffi should have known what the duties of his position were.

22.     Upon receipt of Mr. Zeitel's task list, Riffi "reassigned and redistributed" several of *her managerial tasks* to Mr. Zeitel. For instance, Riffi tasked Mr. Zeitel with creating and managing the team's schedule and completing all QA reports which had previously been assigned to her. Riffi also stated that she would not be available for queue monitoring for most of the day

and that she expected Mr. Zeitel to handle all monitoring. Though Mr. Zeitel had been heavily involved in team management (i.e., completing managerial tasks outside of his job description) prior to Riffi's promotion, it was during this meeting that Riffi attempted to task him with her few remaining managerial duties.

23. Mr. Zeitel was confused about why he was being assigned Riffi's Team Lead managerial work because Broome had, only days earlier, informed him that the managerial tasks would be "covered" by Riffi and Seward. Mr. Zeitel informed Riffi about his conversation with Broome and the comments Broome made regarding assignment of the managerial duties. In response to Mr. Zeitel "pushing back" against being assigned Riffi's tasks, she called a one-on-one meeting with him.

24. During this Zoom videoconference meeting, which Riffi recorded, she informed Mr. Zeitel that he could no longer work overtime, and she advised him to stop answering team questions—a central function of his job as Senior Product Expert. This shocked and upset Mr. Zeitel for several reasons. First, Mr. Zeitel worked approximately fifteen (15) hours of overtime per week, and he and his family counted on this additional income to make ends meet. Riffi was well-aware that Mr. Zeitel and his family counted on his overtime pay. Second, Mr. Zeitel would be unable to complete all the work assigned to him if he was limited to a 40-hour work week. Mr. Zeitel expressed his concerns to Riffi and tried to explain why he needed the overtime hours. Riffi responded that Mr. Zeitel was being "vindictive and spiteful" towards her, and that she would no longer approve his overtime.

25. Following his meeting with Riffi, Mr. Zeitel emailed Broome requesting clarification on assignment of managerial tasks of the Team Lead and Riffi's proclamation that he

would be denied overtime moving forward. Broome, having recently taken paternity leave, did not respond to Mr. Zeitel's email.

26. Having received no response from Broome, Riffi's then-supervisor, Mr. Zeitel reached out to Defendant's Human Resources Department (HR) for assistance. He explained his concerns about losing his ability to work overtime. In April 2021, Shawna Vandenheuvel ("Vandenheuvel"), Defendant's Vice President of Client Services, called a meeting with Mr. Zeitel, Seward, and Veronica Miro ("Miro"), Defendant's HR representative. During the meeting Vandenheuvel explained that Mr. Zeitel could work overtime as needed to complete work on behalf of iContact. She also assigned Seward to be Mr. Zeitel's supervisor moving forward to avoid additional retaliation from Riffi moving forward. Lastly, Vandenheuvel reviewed Mr. Zeitel's job duties to ensure that he was assigned only the tasks that were appropriate for his position and his "extra projects."

27. As agreed upon with Vandenheuvel, Mr. Zeitel's job duties as a Senior Product Expert were as follows: (1) billing tasks; (2) billing escalations (processing refunds and responses to customers escalated billing questions); (3) Spanish volume; (4) old iContact Pro volume; and (5) Help Portal updates. Additionally, Mr. Zeitel's "extra" job responsibilities (for which he was not compensated) consisted of specialized CS training and retention trainings.

28. In May 2021, Mr. Zeitel began his intermittent paternity leave to spend time with his family after the birth of his third child.

29. Mr. Zeitel returned from paternity leave on September 1, 2021, to learn that Seward, his longtime supervisor, had been let go. He was also informed that Riffi would, again, be his supervisor.

30.    Soon after the announcement, Riffi called a meeting with Mr. Zeitel and Denys, the Team Lead for the Tier 1 Team in Ukraine,[1] and informed them that Seward's managerial tasks would need to be reassigned. She stated that Denys and Mr. Zeitel had two options: 1) Seward's duties could be redistributed between the three of them (Denys, Mr. Zeitel and Riffi) and each receive additional pay, or 2) a new person would be hired to fill Seward's position. Denys and Mr. Zeitel agreed that they would like to take on Seward's tasks for additional compensation. Riffi indicated she would discuss with upper management and get back to them.

31.    Upon information and belief, at the time of Seward's termination, Defendant did not consider promoting Mr. Zeitel to a full-time management role, even though Seward had been preparing Mr. Zeitel for such a promotion. In fact, prior to his termination, Seward informed Mr. Zeitel that he had recommended Mr. Zeitel to upper management for promotional opportunities. Mr. Zeitel had been trained on nearly all the responsibilities of an upper-level management positions, including completing one-on-one meetings with agents (mini monthly performance reviews and question sessions to benefit agent growth and development, and address any potential issues). Mr. Zeitel was familiar with all relevant Company policies, processes, and procedures, in addition to his experience doing pretty much all other tasks associated with being a team lead at iContact. A position such as Team Lead was the logical next step in his career path. Though his supervisor repeatedly recommended him for such promotions, however, Defendant failed to promoted Mr. Zeitel, despite recommendations by his direct supervisor, numerous job openings, and his reputation for outstanding work as reflected in his performance review and award nominations by both his team and Company management. Instead, Defendant continued to promote Riffi, a less qualified Caucasian female over Mr. Zeitel.

---

[1] In this role, Denys had decision-making authority over his Tier 1 agents.

32.    In October 2021, Mr. Zeitel met with Riffi to complete his 2021 performance review. Riffi started the meeting by stating Mr. Zeitel does a great job assisting the team members that he supervised. After discussing the performance review questions, Riffi began discussing which of Seward's duties she expected him to take over, including completion of all Tier 3 QAs and additional tasks, which were "to be determined." She also mentioned that she expected Mr. Zeitel to continue answering telephone calls, a task that had not been part of his job description since 2016-2017.

33.    Mr. Zeitel indicated that he would be happy to take on this additional managerial-level responsibility, so long as he was compensated accordingly. He explained that he had been working for years toward a management-level promotional position and was not comfortable taking on the responsibilities without commensurate pay and job title. Mr. Zeitel also stated that he would like to speak with Vandenheuvel for clarification regarding the new position and duties prior to agreeing to accept additional responsibilities. Riffi became very frustrated and told Mr. Zeitel not to "go above" her to Vandenheuvel directly because that would be viewed negatively by management and would likely hurt his chance at a promotion. Riffi stated she had nothing left to discuss with Mr. Zeitel and stated she would be in touch.

34.    A few days after their meeting, Mr. Zeitel received a copy of Riffi's review, which was excessively negative. Mr. Zeitel was shocked by the review because during his previous five (5) years with iContact, he had never received a negative evaluation while employed with the Company.

35.    Mr. Zeitel contacted Defendant's HR Department regarding the negative performance review because it directly impacted his ability to earn merit-based bonuses and his promotional opportunities. A few weeks later, a meeting was held regarding Mr. Zeitel's recent

10

complaint to HR. Meeting attendees included Mr. Zeitel, Vandenheuvel, Susan Sestak, HR Manager of the Moz Group (Defendant's parent company), and Chris Fothergill-Brown ("Brown"), the recently hired Senior Manager of Support hired to replace Broome.[2]

36.     At the outset of the meeting, Vandenheuvel apologized to Mr. Zeitel for the performance review not being completed "to standard." Mr. Zeitel requested that the incorrectly completed report be removed from his file so as not to hamper his career development prospects. Mr. Zeitel's request was ignored, and instead, Brown presented Mr. Zeitel with a modified job description, which stripped him of all his supervisory tasks and responsibilities, including QAs, escalations, and providing feedback to his team members.[3] The "modified" job description added that Mr. Zeitel would be responsible for answering phones and answering customer questions, as well as any "additional responsibilities" assigned by Riffi. Based on experience, Mr. Zeitel knew this "anything clause" would allow Riffi to assign her work to him carte blanche. According to the job description presented during the meeting, Mr. Zeitel was being demoted to Product Expert, the position he held when he was hired by Defendant in 2016.

37.     Mr. Zeitel was stunned to receive this "modified" job description because Vandenheuvel had confirmed his Senior Product Expert job description during the April 2021 HR meeting. He explained that he was very uncomfortable agreeing that his job duties no longer included the supervisory duties of his Senior Product Expert position, and he stated he was being treated discriminatorily by the Company and was being retaliated against because he was being

---

[2] Interestingly, Mr. Zeitel had been tasked by Riffi to train Brown on iContact's system and applications.

[3] The "modified" job description Brown provided during this HR meeting removed the following tasks from Mr. Zeitel's job description: (1) Pulls and provides support-related reports to the management team, currently DAS/DAR; (2) Complete QAs of Reps to gauge performance and provide coaching when necessary; (3) Notify Management of any performance or behavioral trends that needs to be addressed with agents; and (4) Act as a Coach and Mentor for Support Representatives to build and maintain required skillsets. Additionally, the "modified" job description added the following duties to Mr. Zeitel's job description: (1) Phone, Chat, and Email when required by the business; and (2) Additional responsibilities as assigned to best support an exceptional customer experience.

11

demoted. Brown agreed to let "things stay as-is," and stated the Company would "get back with him." At the conclusion of the meeting, Mr. Zeitel believed that he was to keep his existing supervisory duties while Defendant determined next steps with regard to assigning Seward's duties. For the next few weeks, Mr. Zeitel continued to work and complete assigned tasks and "extra duties", as he had done since he was promoted to the Senior Product Expert position in 2018.

38.     In November 2021, Mr. Zeitel turned in his October 2021 QA reports. Riffi responded that he had done "a great job with the QAs," but moving forward all QA reports would be handled by "upper management." She also insinuated that Mr. Zeitel would be working in "more of a support role moving forward." Brown told Mr. Zeitel that "more clarity and direction will be forth coming."

39.     Mr. Zeitel reached out to Brown regarding Riffi's removal of his supervisory duties. Again, Mr. Zeitel explained that he did not want his supervisory duties removed; rather, he did not want Riffi unloading her job duties onto him without compensation. Mr. Zeitel stated that "I was already doing the work. I wanted to keep doing the work, [but] just be recognized for it."

40.     Within a week of Riffi removing QAs from Mr. Zeitel, she informed him that he would no longer be allowed to answer questions from his team members, and that he should focus on first-level support interactions (telephones, chats, and emails)—duties he had not had since he was promoted from Bilingual Product Expert. Riffi also instructed the team members to no longer reach out to Mr. Zeitel with questions, instead they were instructed to reach out to the Tier 2 group team. Again, Riffi has stripped Mr. Zeitel of his Senior Product Expert job duties, essentially relegating him to a lower position. For the prior three (3) years, Mr. Zeitel had been the subject

matter expert for his team, and the person that his team members turned to when they needed assistance responding appropriately to a customer's question or concern.

41.     Interestingly, in recent years, Defendant had phased out its Spanish support team, and moved all support, including bilingual support, in-house. As a result, Mr. Zeitel was assigned all Spanish accounts—a task that other supervisory level personnel would not have been required to complete. During the time his supervisory tasks were being removed, Mr. Zeitel was reminded to continue servicing his Spanish accounts. In fact, Riffi described Mr. Zeitel as "the only Spanish line we have lol."

42.     Over the next several weeks, Riffi continued to slowly remove Mr. Zeitel's supervisory job duties. Additionally, Riffi would give Mr. Zeitel instruction to complete a task and then change the task or tell him he had completed it incorrectly, even though he had acted in accordance with her directive. Riffi constantly "moved the goal posts" to prevent Mr. Zeitel from completing the task.

43.     In early December 2021, Mr. Zeitel made a third complaint to HR, and indicated that Riffi was discriminating and retaliating against him. He expressed his concern that when he complained to HR previously in September 2021, Defendant attempted to demote him by removing his supervisory duties, essentially relegating him back to answering telephone calls, chats, and emails, and providing Spanish support.

44.     On December 3, 2021, shortly after making his third complaint to HR, a meeting was held between Mr. Zeitel, Brown, and Sestak. During the meeting, Mr. Zeitel attempted to explain issues he and his team were having, to which Brown responded, "this is a Bruno issue, not a team issue." Further, Brown stated that during the October 2021 HR meeting, Mr. Zeitel had agreed to the "modified" job description which removed all supervisory tasks and duties. Lastly,

13

Brown informed Mr. Zeitel that, after five (5) years, because of these issues, he would be removed from the Support Leads channel, as well as all support lead meetings and standups. Mr. Zeitel was very upset and emotional during this meeting—he begged that Brown and the Company not to do this to him. He explained how hard he had worked trying to advance his career within iContact. Again, Mr. Zeitel expressed his belief that he was being discriminated and retaliated against, and that he would contact the EEOC.

45.     A few days after the meeting, Mr. Zeitel contacted the EEOC to set up an intake interview. He also submitted a complaint to Ethics Point, Defendant's internal complaint communication channel. Mr. Zeitel had an interview with an Ethics Point investigator who indicated that his complaints would be shared with higher level management personnel.

46.     However, the response Mr. Zeitel received from the Company's HR Representative through the Ethics Point portal was that in October 2021, he agreed to the "modified" job description and had voluntarily relinquished his supervisory duties. Mr. Zeitel knew his complaints had, again, fallen upon deaf ears, so he began uploading his documentary evidence to the Ethics Point portal. Because of the volume of documentation Mr. Zeitel provided, the Company's upper-level HR representative assured him they would review all documentation he uploaded to the Ethics Point portal and informed him it would take approximately one month for them to review his documents and get back with him regarding a solution.

47.     On January 22, 2022, Mr. Zeitel had his EEOC interview and formally submitted and filed his Charge of Discrimination against Defendant.

48.     In early February 2022, Mr. Zeitel was contacted by Defendant's upper-level HR/management representative through Ethics Point who indicated they had reviewed his

documentation and would like to set up a meeting. Mr. Zeitel also provided Defendant's HR representative with the EEOC Charge Number.

49.     Approximately one to two weeks later, Mr. Zeitel had a meeting with Willow Mack ("Mack"), Defendant's Senior Vice President of People Operations and Transformation. Mack presented Mr. Zeitel with two options to move forward with iContact: 1) He could continue working pursuant to his "modified" job description, i.e., be demoted from Senior Product Expert to Product Expert, the job he was hired to do in July 2016; or 2) He could take a "new position" in the Office of President of the Moz Group, Defendant's parent company, as the Senior Escalations Specialist. In this position, Mr. Zeitel would be the highest level of escalation before an issue became a matter for the Company's Legal Department. He would be responsible for responding to subpoenas and EEOC Charges, investigating internal Company complaints, and enforcing various Company policies. Mr. Zeitel expressed great interest in the Senior Escalations Specialist position.

50.     A few days later, Mack contacted Mr. Zeitel to provide more details about the new position. She informed him that his salary would remain the same—$53,000 annually; however, he would no longer be eligible for overtime. Mr. Zeitel was shocked at the salary offered—He conducted research about pay for similar positions, which was upwards of $100,000. Instead, Mr. Zeitel was being offered a senior level management position, one with immense responsibility, for pay commensurate with a middle-management staff member. In fact, because Mr. Zeitel would no longer be entitled to receive overtime pay, his take-home salary would be less if accepted the Senior Escalations Specialist position. Mr. Zeitel explained this to Mack, who said she would get back to him with a solution.

51.     A few days following his second meeting with Mack, she contacted Mr. Zeitel and stated that with overtime pay, he had made approximately $90,000 in 2021, so Defendant was

prepared to offer him $92,000 for the Senior Escalations Specialist position. Though this offer was better, the salary was still based on his income as a Senior Product Expert, not the position he was being offered. The $92,000 per year salary offered was below market for the position and Mr. Zeitel's skill-level. Mr. Zeitel expressed his continued interest in the Senior Escalations Specialist position; however, he indicated he would like to negotiate the salary *based on the job he was being offered*, not his previous position.

52. Mack immediately responded that the offer for the Senior Escalations Specialist position was "off the table," and Mr. Zeitel's only option was to work pursuant to the "modified" job description. Mr. Zeitel explained he would like to continue working, but not pursuant to the modified job description, which was essentially a demotion.

53. Mack stated that it was not productive to discuss his job duties, and that she needed a "yes or no" from him regarding his modified job description. Mr. Zeitel stated that he would agree to work "only the job I was working without retaliation or demotion." Mack responded that since he would not agree to the job offered to him, he was terminated, effective February 28, 2022.[4]

54. Defendant offered Mr. Zeitel a small severance package; however, it was contingent upon Mr. Zeitel withdrawing his EEOC Charge and releasing the Company from all liability arising from his employment. Mr. Zeitel refused the severance package.

55. As is set forth herein, Defendant intentionally discriminated and retaliated against Mr. Zeitel because of his national origin in violation of Title VII and 42 U.S.C. § 1981.

56. As a direct result of Defendant's unlawful discrimination and retaliation, Mr. Zeitel suffered and continues to suffer damages. Defendant is liable to Mr. Zeitel for all damages and

---

[4] On or about February 25, 2022, just three (3) days before he was terminated, Mr. Zeitel was nominated for the 2021 Q4 Achievement Award.

remedies available to him under the law, including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, and attorneys' fees.

57.     As a further direct and proximate result of Defendant's unlawful discrimination and retaliation, Mr. Zeitel has suffered and continues to suffer from anxiety, stress, and other mental and emotional damages.

### FIRST CLAIM FOR RELIEF
**National Origin Discrimination/Disparate Treatment in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991, 42 U.S.C. § 1981**

58.     Plaintiff reiterates and realleges each and every paragraph above and incorporates each hereto as if set forth fully herein.

59.     As a Hispanic of South American descent, Mr. Zeitel is a member of a protected class, and thus, satisfies the threshold requirement.

60.     Prior to the adverse employment actions and retaliation described hereinabove, Mr. Zeitel was performing his job at iContact satisfactorily. In early 2021, he was awarded the Q4 Achievement Award for his outstanding performance during the Company's fourth quarter in 2020. He was nominated for this award by his peers. Additionally, Mr. Zeitel's supervisor, Nick Seward gave him an outstanding performance review.

61.     Additionally, Mr. Zeitel provided his team members with consistent and outstanding support and guidance, which, in turn, helped the people he managed excel at their jobs. He consistently performed work outside of his job description, including continuing to answer most telephone calls and online chats requiring Spanish-speaking assistance, though he had been promoted from Bilingual Product Expert in 2019.

62.     Despite receiving praise for his work from his supervisor Seward, being recommended for promotional opportunities, and receiving awards for his outstanding work

performance on behalf of the Company, Mr. Zeitel was passed over for promotions in favor of a less-experienced, less-proficient Caucasian employee, Riffi. Defendant failed to promote Mr. Zeitel because the Company needed him to remain low enough on the "totem pole" to be responsible for all first-level support to Spanish-speaking customers and accounts.

63.     At all times relevant to this Complaint, Mr. Zeitel was treated differently than his counterparts, including Riffi, because of his national origin. Though Mr. Zeitel performed his job at a level that exceeded Defendant's expectations, iContact nevertheless, (a) promoted Caucasian employees with less experience then him to positions for which he was better qualified; (b) refused to place him in open, available managerial roles, including the Team Lead following Riffi's promotion to Customer Operations Manager; (c) expected him to take on managerial tasks without promotion or commensurate pay; (d) demoted him when he voiced objection to Defendant removing his managerial responsibilities (i.e., Riffi's Team Lead duties after she was promoted) with increased focus on his support of the Spanish accounts; and (e) ultimately, terminated him when he again refused to take on the role of Senior Escalations Specialist, a high level position reporting to the highest levels of Defendant's senior management team, for the same salary he had been making as a Senior Product Expert.

64.     Furthermore, Defendant would not have offered Mr. Zeitel the Senior Escalations Specialist if he had not been satisfactorily performing his previous job duties.

65.     Defendant treated a member outside of Mr. Zeitel's protected class of national origin more favorably by promoting Riffi, a less qualified, less proficient Caucasian employee over Mr. Zeitel and expecting him to continue providing first-level support to all Spanish accounts though this task was not in his job description. Just prior to his termination, Defendant had no other Hispanic employees on staff at iContact.

66.     Defendant, on more than one occasion, failed to promote Mr. Zeitel, the more qualified candidate, in favor of Riffi, a Caucasian. Once Mr. Zeitel began complaining to Defendant's upper-level management and HR Department about the discrimination, the Company began removing his managerial responsibilities, in favor of him focusing on first-level customer support and Spanish support. Defendant's decision to remove his managerial tasks in favor of Mr. Zeitel focusing on Spanish support, and other first level customer support, creates an inference that the Company impermissibly demoted Mr. Zeitel because of national origin, and his complaints of discrimination based thereon.

67.     In terminating Mr. Zeitel, Defendant engaged in unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1) and 42 U.S.C. § 1981. Specifically, Defendant, through its managerial staff, discriminated against Mr. Zeitel by treating him less favorably than employees outside of his protected class of national origin by removing his managerial duties in response to his complaints of discrimination and disparate treatment, and ultimately terminating him.

68.     By failing to promote Mr. Zeitel in favor of a less experienced Caucasian employee, expecting him to take on managerial tasks without compensation therefore, demoting him when he requested to be compensated for the work he did and insisting he focus on first-level support and Spanish support, and ultimately terminating him, Defendant, through its managerial staff, acted intentionally, maliciously and with reckless indifference to his federally protected right to be free from discrimination and disparate treatment based on his national origin.

69.     Defendant's conduct, by and through its managers, deprived Mr. Zeitel of equal employment because of his national origin.

70.     It was reasonably foreseeable that Mr. Zeitel would incur damages, including but not limited to lost wages, as a result of Defendant's unlawfully terminating him.

71.     As a direct and proximate result of Defendant's violations of Title VII and 42 U.S.C. § 1981 as described herein, since his termination from iContact, Mr. Zeitel has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, and other non-pecuniary damages.

72.     As a result of all of Defendant's acts and omissions as set forth herein, Defendant is liable to Mr. Zeitel for all damages sustained due to Defendant's unlawful termination and is entitled to all remedies available to him authorized by law including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, attorneys' fees, etc.

**SECOND CLAIM FOR RELIEF**
**Wrongful Discharge in Violation of**
**North Carolina Public Policy**

73.     Plaintiff reiterates and realleges each and every paragraph above and incorporates each hereto as if set forth fully herein.

74.     As set forth herein, Defendant unlawfully discriminated against Mr. Zeitel because of his national origin, in violation of Title VII and 42 U.S.C. § 1981. *See* Paragraphs 58-72, *supra*.

75.     Additionally, Defendant's acts, as described herein above, contravene and violate the public policy of the State of North Carolina as set forth in North Carolina's Equal Employment Practices Act (EEPA). The EEPA declares that it is the public policy of this State to "protect and safeguard the right and opportunity of all persons to seek, obtain and *hold employment* without discrimination or abridgement on account of … *national origin*…." *See* N.C. Gen. Stat. § 143-422.2. (emphasis added).

76.     As set forth above in Paragraphs 58-72, *supra*, Defendant engaged in unlawful employment practices in violation of North Carolina law. Specifically, Defendant, through its managerial staff, discriminated against Mr. Zeitel in favor of a less experienced Caucasian employee, expecting him to take on managerial tasks without compensation therefore, demoting him when he requested to compensated for the work he did and insisting he focus on first-level support and Spanish support, and ultimately terminating him, thereby denying him the opportunity to "hold employment without discrimination…on account of national origin" in violation of North Carolina public policy as codified in N.C. Gen. Stat. § 143-422.2. Plaintiff's termination, therefore, constitutes wrongful discharge under North Carolina law.

77.     Mr. Zeitel is entitled to compensation for lost wages, lost benefits, front pay, back pay, economic losses and any other applicable damages pursuant to North Carolina law.

**THIRD CLAIM FOR RELIEF**
**Retaliation in Violation of Title VII**
**of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.***

78.     Plaintiff reiterates and realleges each and every paragraph above and incorporates each hereto as if set forth fully herein.

79.     Mr. Zeitel complained about the disparate treatment he endured on the basis of his national origin, as described herein, to Defendant, by and through its upper management, including Vandenheuvel, Defendant's Senior VP, and Defendant's HR Department on two (2) separate occasions—once in October 2021 and again in December 2021. Additionally, Mr. Zeitel contacted the EEOC in December 2021 and formally submitted an EEOC Charge on January 22, 2022. Mr. Zeitel's internal complaints of discrimination and disparate treatment based on his national origin and his complaint to the EEOC constitute protected activities under federal law.

80.     After he complained to HR in October 2021 and December 2021 regarding the disparate treatment and discrimination he endured, as described hereinabove, Defendant's HR Department set up meetings with Mr. Zeitel and various members of its managerial staff—typically within one to two weeks following his initial compliant. During each of these meetings, Defendant stripped Mr. Zeitel of certain supervisory tasks that he had been completing for five-plus years. For instance, Defendant took away his reporting responsibilities and his ability to answer questions posed by the team members he previously supervised. In removing these responsibilities from Mr. Zeitel, he was being asked to focus more on first-level support and support for Spanish customers. By removing his managerial responsibilities, Mr. Zeitel was effectively demoted to his previous role of Bilingual Product Expert, the role he was hired into in 2016.

81.     Following the meeting with HR in December 2021, Mr. Zeitel knew Defendant, by and through its upper management and HR representatives was not going to remedy the situation and allow him to continue in his middle-management position of Senior Product Expert. Thereafter, he filed an internal complaint with Defendant's Ethics Point portal and submitted a Charge of Discrimination with the EEOC on January 22, 2022. Shortly after his Charge was filed, he provided Defendant's HR representative with the EEOC Charge number.

82.     A few weeks after he notified Defendant that the EEOC Charge had been filed, Defendant made a sham offer to promote Mr. Zeitel to Senior Escalations Specialists for the same salary he had been making as a middle-management team member. When Mr. Zeitel stated he would rather stay in his current role as Senior Product Expert, performing the same middle-management tasks and "extra" responsibilities he had been performing since 2018 rather than take

the promotion, which carried great responsibility for pay that was less than market value for the position, he was terminated.

83.     A causal connection exists between Mr. Zeitel's complaints of discrimination and disparate treatment based on his national origin and the adverse actions taken against him as set forth above because 1) Defendant, within weeks of his complaints, began stripping him of the managerial tasks he had been tasked with for over five years, ensuring he would never receive the promotion he had been working towards, 2) Defendant emphasized that Mr. Zeitel should focus on first-level customer support and his Spanish accounts, and 3) within only a couple weeks after he submitted his EEOC Charge, Defendant terminated Mr. Zeitel when he requested to stay in his current position with his the same responsibilities he had had for over five years instead of accepting a promotion at a salary less than market value.

84.     Because Defendant would only allow Mr. Zietel to remain employed under the condition that he be stripped of his managerial responsibilities, he was ineligible for certain promotional opportunities.

85.     Defendant, by and through its upper management employees, including but not limited to Riffi, Brown, and Mack, began and continued to retaliate against Mr. Zeitel because he complained about the discrimination and disparate treatment he endured in the workplace, which ultimately resulted in his termination.

86.     As a direct and proximate result of Defendant's retaliation as described herein, Mr. Zeitel has suffered and continues to suffer damages, including emotional distress, pain and suffering, mental anguish, loss of enjoyment of life and other non-pecuniary damages.

87.     As a further direct and proximate result of Defendants retaliation as described herein, Mr. Zeitel is entitled to recover all damages and remedies available under the law to him

including, but not limited to, front pay, back pay, compensatory damages, liquidated damages, costs, attorneys' fees, etc.

## FOURTH CAUSE OF ACTION
### Punitive Damages

88.     Plaintiff reiterates and realleges each and every paragraph above as if set forth fully herein.

89.     The acts of Defendant alleged hereinabove were committed with either an evil motive and/or with reckless and wonton disregard for the rights of Mr. Zeitel

90.     As described hereinabove, Defendant, through its managerial staff, acted willfully, consciously, and with intentional disregard of, or showed reckless indifference to Mr. Zeitel's constitutional right to be free from discrimination and retaliation based on his national origin. Defendant consciously and maliciously has and continued to remove Mr. Zeitel's middle-management supervisory tasks in a discriminatory and retaliatory manner in order to force him to focus on first-level customer support, particularly the Spanish accounts that he was solely responsible for, and for the purpose of ensuring that he would not be eligible for promotion.

91.     As a direct and proximate result of Defendant's intentional, reckless and/or willful and wanton conduct, Mr. Zeitel has suffered and continues to suffer damages, including emotional distress, pain and suffering, mental anguish, loss of enjoyment of life and other non-pecuniary damages.

92.     Based on the foregoing and, pursuant to N.C. Gen. Stat. § 1D-15, Mr. Zeitel is entitled to recover punitive damages from Defendant.

## JURY DEMAND

Plaintiff demands a trial by jury of the claim asserted in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays the Court for judgement against Defendant to the full extent permitted by 29 U.S.C. § 794a(a)(1), 42 U.S.C. § 2000e-5(f)-(k) and 42 U.S.C. § 1981a, including but not limited to, the following:

1.      Judgment in Plaintiff's favor, determining that Defendant's actions and conduct towards and relating to Plaintiff violated the Title VII of the Civil Rights Act of 1964, and the Civil Rights Act of 1991.

2.      Award Plaintiff all monetary damages incurred, including but not limited to back pay, front pay, interest, and benefits.

3.      Award Plaintiff damages for mental anguish, emotional distress and other non-pecuniary damages.

4.      Award Plaintiff punitive damages as a result of the intentional unlawful actions and conduct of Defendant under the Civil Rights Act of 1964, and the Civil Rights Act of 1991.

5.      Award Plaintiff the costs, disbursements, expenses, reasonable attorneys' fees and expert witness fees incurred by Plaintiff in filing and prosecuting this action pursuant to 42 U.S.C. § 1981a and as may be authorized by any other applicable federal laws;

6.      For an award of pre- and post-judgment interest to Plaintiff on all damages; and

7.      For all other, further relief as this Court deems just and appropriate.

This the 6th day of June, 2022.

Respectfully submitted,

/s/ Lindsey A. Bullard
Lindsey A. Bullard, N.C. Bar No. 46664
Dawn T. Mistretta, N.C. Bar No. 31691
GREEN MISTRETTA LAW, P.L.L.C.
1752 Heritage Center Drive, Suite 101
Wake Forest, NC 27587

25

Telephone:    (919) 278-7453
Facsimile:    (855) 876-8893
dmistretta@gmlawyers.org
lbullard@gmlawyers.org
*Counsel for Plaintiff*

26